Statement.

## Richmond.

GRINNAN AND OTHERS v. FREDERICKSBURG LODGE, No. 4, ANCIENT FREE AND ACCEPTED MASONS AND OTHERS.

March 16, 1916.

1. DEAD BODIES—*Removal—Power of Court of Equity.*—A court of equity has the power, notwithstanding the absence of legislation on the subject, to authorize, in its sound judicial discretion, the removal of graves or cemeteries in a proper case after due consideration of all the facts and with due regard to the rights and feelings of all concerned.

2. CEMETERIES—*Rights of Lot Owner—License—Discontinuance—Removal.*—The purchaser of a lot in a cemetery does not acquire absolute right in, or dominion over, such lot. According to the weight of authority such purchaser acquires a mere license or privilege to make interments in the lot exclusively of others as long as the burying ground or cemetery remains as such. This license or privilege is subject to the condition that if, in the course of time, it becomes necessary to vacate the ground as a burial place he shall have notice and the opportunity of removing the bodies and monuments to some place of his own selection, or, on his failure so to do, such removal shall be made by others.

3. DEAD BODIES—*Removal—Desecration—Case in Judgment.*—Every removal of graves is not a desecration. On the contrary, such removal is often dictated by the highest considerations of duty and respect for the dead. In many instances not only graves but whole cemeteries are removed to another and different locality, and the idea that such removal is a desecration is negatived by our statute (Code 1904, sec. 1406-a) which permits the removal of cemeteries under certain circumstances and conditions. In the case in judgment, the removal of the graves, instead of desecrating the sepulchre of complainants' dead, will rather tend to preserve and beautify their resting place.

Appeal from a decree of the Circuit Court of Spotsylvania county. Decree for the defendant. Complainants appeal.

*Affirmed.*

The opinion states the case.

*A. T. Embrey* and *Samuel A. Anderson,* for the appellants.

*St. George R. Fitzhugh, C. O'Connor Goolrick, W. W. Butzner, Granville R. Swift, W. R. Goolrick* and *F. M. Chichester,* for the appellees.

HARRISON, J., delivered the opinion of the court.

By deed dated April 5, 1784, and duly recorded on that day, James Sommerville conveyed a lot containing one-half acre in the town of Fredericksburg to Charles Mortimer, William McWilliam, Alexander Dick, and others, and their heirs, to have and to hold the same in trust to and for the use of the master, wardens, officers, fellows and brethren of the Fredericksburg Lodge of Freemasons and their successors, members of the said lodge, forever, and for and to no other use, interest or purpose whatsoever. The present Lodge No. 4 of Freemasons, in the city of Fredericksburg, is by succession the same lodge mentioned in the deed from James Sommerville.

It appears that very soon after the acquisition of this lot the Masons, by acts *in pais,* dedicated the same as a burial place for its deceased members and their families, and it has ever since such use began been known as the "Masonic cemetery." The records of the lodge furnish no evidence that its trustees or their successors, or the officers or brethren of the lodge, ever attempted or designed to make any such formal or permanent dedication of the lot as a burial place for Masons, or claimed any such right or authority, under the terms of their deed, as would estop them from applying the same or a portion thereof to other uses than that of a burial place. The dedication has resulted from the long and uninterrupted acquiescence of the lodge in such use until a large number of interments have been made therein.

It further appears that the lodge takes a natural pride in the fact that George Washington, the "Father of His Country," first saw the light of Masonry within its ancient precincts. This circumstance has in recent years inspired a desire on the part, not only of the members of this lodge, but of the Masons all over the country, to build thereon a stately and beautiful temple, to be known as the "George Washington Memorial Temple," as a fitting memorial of the "Father of His Country," who became a Mason in the lodge, and where the Bible used in his initiation is sacredly preserved, and at the same time to afford a suitable home for this ancient and historic lodge. To this object the Masons all over the country have already contributed .a considerable sum.

In furtherance of this desire, the lodge on the 1st day of February, 1912, in pursuance of notice previously published, held a largely attended meeting, and with practical unanimity adopted a resolution determining to erect on a portion of the Masonic cemetery lot the temple in contemplation. This resolution sets forth the purpose of the lodge as follows:

"The undersigned committee and officers of the said lodge, therefore, desire to state to all concerned that the lodge proposes to use a portion of said lot for the purpose of erecting the said temple thereon, said portion so proposed to be used being described as follows: . . . In the above described area there are seventy-two graves, more or less, which it is the purpose of the lodge to move in reverent and proper manner, beginning March 20, 1912, across the northern line in the above-described lot and there reinter the remains of those now interred in said graves. In other words, to simply move said remains to another portion of the 'Masonic graveyard,' and there reinter them, marking the new graves with the stones and monuments which now mark the old. All of the above labor will be done under the direct supervision of a committee of the said lodge, with a due regard for the sanctity of the dead, and due regard for the wishes of the living, so far as not incompatible

with the plan above outlined. Relatives or friends of deceased persons may, if they so desire, have the remains of any person or persons removed and reinterred in that portion of the cemetery to be set apart for this purpose, and the lodge will pay the reasonable expenses of such removal and reinterment. It may not be out of place to say that Fredericksburg Lodge owns the said Masonic graveyard in fee simple and has done so for over one hundred years, that from time to time the remains of deceased persons have been interred there with the acquiescence of the lodge, however, always reserving its title to the grounds; that for many years this graveyard has been in a neglected and abandoned condition, owing to the complete and continued failure of the relatives of those whose remains are therein interred to spend either time or money in keeping the cemetery or graves in proper order, and that its condition has been a continuous reproach to all concerned therewith. The people of Fredericksburg know too well its past and present condition to require any further explanation thereof. When this proposed memorial temple to the great Mason in whose honor it is proposed to build it shall be erected on the site selected, as we trust it soon will be, the very fact of its erection on a part of the old burying grounds will be the strongest guarantee that the graves in the other portion of this lot, where there is ample room for these reinterments, will hereafter be kept in proper condition, whereas, judging the future by the past, if present conditions continue it will be a matter of a few years before every grave in the old cemetery will have gone to rack and ruin and the identity of the cemetery itself completely and everlastingly lost. In this spirit, therefore, Fredericksburg Lodge No. 4, A. F. and A. M. proposes to erect on the portion of this lot described a handsome memorial temple dedicated to George Washington who first saw the great light of Masonry within the confines of this lodge room."

In little more than one month after the adoption by the lodge of the resolution mentioned, Daniel Grinnan and others

filed the bill, which is the foundation of this litigation, alleging that their grandfather, grandmother and about seven other relatives were buried in that portion of the Masonic cemetery from which it was proposed by the lodge to remove the graves, and praying that those graves in which they were interested might be protected from the invasion and desecration proposed by the lodge; that "the ground where the deceased members of their family are buried is to them a sacred place, and is held by them in great veneration and esteem—a sentiment that prevails among all civilized nations; and that the said burial place has been held in great veneration and esteem in their family for a period of at least eighty years; that they view with great aversion and horror any attempt that persons might make to disturb or molest in any way their dead lying in said cemetery, or their tombstones; and that they would be recreant to their duty if they did not resist any such attempt." The complainants further allege that they have legal rights in the spot of ground where their dead are buried, which they rely on to protect such spot from molestation or disturbance.

In response to the prayer of the bill an injunction was granted, which was subsequently dissolved and the bill dismissed, after a hearing upon all the facts and circumstances adduced by both the plaintiffs and defendants. From that decree the present appeal was taken.

There is nothing in our statute law applicable to the facts here presented, nor is there anything in such statutes showing that the policy of this Commonwealth is averse to the removal of graves in a reverent and proper manner under all circumstances. Code 1904, sec. 1416-a. There can, however, be no question of the power of a court of equity to deal with a situation like the present, notwithstanding the absence of legislation on the subject, and to authorize, in its sound judicial discretion, the removal of graves or cemeteries in a proper case, after the consideration of all the facts and with due regard to the rights and feelings of all concerned.

The courts are much divided as to the character of the estate one may have in a burial lot in a cemetery. It is certain that it is not a fee. The weight of authority is, and we think the better view, that it is a mere privilege or license to make interments in the lot exclusively of others as long as the burying ground or cemetery remains as such. *Kincaid's Appeal,* 66 Pa. St. 411, 5 Am. Rep. 377; *Partridge* v. *The First Independent Church of Baltimore,* 39 Md. 631; *Bessemer Land Co.* v. *Jenkins,* 111 Ala. 135, 18 South. 565, 56 Am. St Rep. 26.

In *Kincaid's Appeal, supra,* the court held that "The lot holder purchased a license—nothing more—irrevocable as long as the place continued a burying ground, but giving no title to the soil  .   .   .   But if in the course of time it should become necessary to vacate the ground as a burying ground, all that he could claim, in law or equity, would be that he should have due notice and the opportunity afforded him of removing the bodies and monuments to some place of his own selection, or that, on his failing to do so, such removal should be made by others. He accepted the grant or license subject to this necessary condition."

. In *Roanoke Cemetery Co.* v. *Goodwin,* 101 Va. 610, 44 S. E. 770, this court says "that a purchaser of a lot in a cemetery does not acquire absolute right in, or dominion over, such lot, but merely a qualified and usufructuary right for the purposes to which the lots are devoted."

In the instant case there was no purchase of lots, not even a certificate issued and held as evidence of title. The chief objection of the complainants is that the removal of the graves of their relatives from one part of this small cemetery to another is an unwarranted injury to their sentiments and feelings.

We are of opinion that, upon consideration of all the facts, the removal proposed in this case would, instead of desecrating the sepulchre of complainants' dead, rather tend to preserve

and beautify their resting place. The evidence abundantly shows that the condition of this cemetery for the past fifty years has been melancholy indeed. In the decree appealed from the learned judge of the circuit court uses this language: "And it further appearing to the court that until the lodge proposed to devote a portion of said lot, as originally intended when the lot was acquired, to the erection thereon of a Masonic lodge, and to dedicate the same as a Memorial Temple to George Washington, who became a Mason in said lodge, and to reinter the bodies removed for that purpose in another portion of said lot, the graves of all Masons and their families buried therein had for fifty years or more been wholly neglected by their descendants, including the plaintiffs in this case, and said cemetery had become an eyesore and a nuisance as set forth in the opinion in writing of the court made a part of the record." In the opinion referred to the court further says: "Courts of equity have permitted the removal of the dead, and the removal of cemeteries under some circumstances, and it seems to me this is a case appealing as strongly to this court as any I have read, where such removal was sanctioned. Only a very small number of relatives of those buried in this cemetery are objecting to the proposed removal. Those who do not object doubtless acquiesce in the proposition, because they know that, unless some fund is provided to maintain the cemetery, especially as there are no more interments to be made therein, and that, therefore, personal interest in its upkeep must in time fail, that in time the melancholy conditions disclosed by the record will be repeated and aggravated, and that ultimately the police power of Fredericksburg will, with alien hands of hirelings, remove their dead. On the other hand, they doubtless see, if the proposition of the lodge is consummated, not only the assurance of a permanent resting place for their dead, but that their place of sepulchre will always be maintained in good order by the tender care of their Masonic brethren."

The evidence justifies a more gloomy picture of the unattrac-

tive and neglected condition of this cemetery than has been drawn by the lower court, but we deem further details with respect to that matter unnecessary. The site of this cemetery is in the centre of the city, in its residential section, fronting on two residential streets, with nothing to obscure or detract from the architectural proportions of the temple that it is proposed to erect on the corner thereof. But far above all other considerations in favor of this site which should commend it to the families of those who are buried there, is, as said by learned counsel, "the fact that the erection of such a temple and home thereon would be a perpetual pledge to all such that the last resting place of the ashes of those whose memory they profess to revere will be sacredly preserved and cared for, as will be the temple and home itself, in whose shadow said ashes will repose, and not until the memory of Washington shall cease to inspire reverence and love in the hearts of mankind will said spot be neglected by future generations of Masons."

We are of opinion, as already said, that the desecration of the graves in which complainants are interested is in the neglected and unsightly spot where they repose, and not in their reverent and careful removal to another part of the same cemetery where their surroundings will be beautified and cared for indefinitely. Every removal of graves is not a desecration; on the contrary, such removal is often demanded by the highest considerations of duty and respect for the memory of the dead. Instances are innumerable where not only graves are removed, but whole cemeteries are transferred to another and different location. The idea that to remove them is a desecration is negatived by our statute (sec. 1406-a, Code, 1904), which permits the removal of cemeteries under certain circumstances and conditions.

In the case of *Little* v. *Presbyterian Church, &c.,* 68 S. C. 489, 47 S. E. 974, a very pertinent authority, after conceding all the right possible in the descendants to protect their dead, and the ground in which they are interred, from unnecessary

invasion or disturbance, it is said: "The very delicate question to be decided in each case is whether, having all the circumstances in view, the proposed removal should be regarded an undue intrusion on the tender sensibilities of those interested. In the consideration it should be remembered that in this comparatively new country the dead have often been buried in very unsuitable places, and that removals have often taken place in the exercise of the most tender sentiment, in view of the future forgetfulness and disregard of the old neighborhood graveyards as the country is changed and developed. If such removals by private individuals tend to promote, rather than destroy, reverence for the dead, the court should certainly hesitate to prevent such action by a church, when it seems to the court that such removal would have a like result. The evidence is clear that this cemetery is much neglected, and its condition is not such as to stimulate any of the finer sentiments of respect due to the dead. If the church is removed, it is extremely probable that it will be still more neglected. . . . When those who now care for them as sacred shall pass away, and the relationship of future generations to these dead becomes more remote, there is little room to doubt that they will be almost, if not entirely, forgotten, and the land used for other purposes. So far, therefore, from the proposition of the church to sell the property and remove the dead to the city cemetery indicating any disregard of the sacredness of the association, we think if carried out it will promote in the highest degree the very high purpose which those who object wish to conserve."

In *Newark* v. *Stockton,* 44 N. J. Eq. 179, 14 Atl. 630, Chief Justice Beasley, speaking for the court, in a case where a court of equity was asked to restrain the city of Newark from removing the dead bodies from an abandoned graveyard in the heart of the city, says: "Nor is the case in this respect strengthened by the fact that the bodies of the ancestors of these prosecutors were permitted to be buried in this cemetery. Such a circum-

stance does not confer on the descendants of such persons the
right to intervene and prevent the property from being devoted,
when necessity or convenience calls for it, to other purposes.
The cases are numerous and uncontradicted settling the law in
this way, so that it is superfluous to refer to them or discuss the
subject. . . . But although the present scheme of con-
verting this tract of land to an alien use could not be carried
into effect by means of the statute which has been enacted for
that purpose, in our opinion the same end could and would be
reached through the intervention of a court of equity. ' . . .
The design of the donors was to provide a place of burial, not
for one or two generations of the inhabitants of this city, but
for all future generations. But this cemetery has long since
ceased to be used as a place of sepulture. Such a use of it
has been and is now forbidden by law. It is a cemetery of the
past—a place where the bodies of a bygone generation repose.
. . . The inhabitants of the city, who are the beneficiaries
of the charity, through their duly constituted authorities, would
stand before the court, showing that the devotion of the land to
its present purpose is, taken as a whole, not a benefit, but a
serious detriment to the public, and that it is reasonable to
remove the bodies in this yard to a more suitable place, to be
provided out of the city treasury, and thus effectuate that part
of this charity that only is susceptible of being carried out.
It is not perceived on what ground a court of equity could
refuse to accede to such a prayer; for it does not seem possible
that any reasonable person would say that this tract of land, in
the most populous part of a large city, should be permitted to
remain, for all future time, devoted merely to its present use;
for to say this would in effect be to maintain that a charity
will be so carried into effect as to work an injury to its benefi-
ciaries. It seems to us plain that, under the conditions pre-
sented, the chancellor, if he has been properly applied to,
would have been bound to permit the designed transmutation

of this property.   And if this be so, then the injunction should not have issued, for the court will not enjoin the act of a trustee of a charitable use, which itself would have directed to be done had the case been before it."

The case of *Partridge* v. *First Independent Church of Baltimore, supra,* is to the same effect.   See also *Bessemer Land Co.* v. *Jenkins, supra.*

In view of the evidence presented by the record before us and in the light of the authorities cited, we are of opinion that there is no error in the decree complained of, and it is affirmed.

*Affirmed.*