National Memorial Park, Inc. v. Commissioner.
National Mem. Park, Inc. v. Commissioner
Docket No. 109938.
United States Tax Court
1943 Tax Ct. Memo LEXIS 226; 2 T.C.M. (CCH) 396; T.C.M. (RIA) 43313; June 29, 1943
*226 Llewellyn A. Luce, Esq., 937 Munsey Bldg., Washington, D.C., for the petitioner. Philip A. Bayer, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: Respondent determined deficiencies in income and excess profits taxes and penalties for the years 1935, 1936, and 1937, as follows: Excess
Income
Profits
Year
Tax
Penalties
Tax
Penalties
1935
$41,978.72
$10,494.68
$15,264.99
$3,816.25
1936
6,211.09
None
1,431.46
None
1937
13,525.91
3,381.48
4,067.32
1,016.83
Petitioner does not contest certain adjustments in respect to depreciation made by respondent. The questions in issue are: (1) Whether petitioner is entitled to a reduction of its gross income for the years here involved by excluding or deducting therefrom, 20 per cent of the sales price of its cemetery lots, either as an amount required to be set aside in a trust for improvement purposes, or as additional cost of the property sold. (2) Whether petitioner is entitled to have its taxable income computed on the installment sales basis. (3) Whether petitioner is subject to delinquency penalties for the years 1935 and 1937. The returns were filed with *227 the collector for the district of Maryland. Findings of Fact Petitioner, a Delaware corporation, was organized on September 7, 1933. During the taxable years, petitioner's outstanding stock consisted of 100 shares of common stock, no par value. During the taxable years, petitioner was engaged in the business of operating a cemetery, known as "National Memorial Park," which is located on the Lee Highway, Fairfax County, Virginia. Petitioner also maintained business offices located in the Woodward Building, the Tower Building, and at 1408 H Street, N.W., Washington, D.C.
The tract of land comprising the cemetery was acquired by petitioner during the year 1933 at a cost of $32,202.32. After acquisition, this tract was plotted into 24,429 salable four-grave cemetery lots. The land contained 92,986 acres, exclusive of public roads, L. & M. Survey, or 4,052.021 square feet, of which 2,540.616 square feet were in salable cemetery lots and 1,511.405 square feet in unsalable property, such as roads, paths, etc. At a meeting of petitioner's directors, on June 12, 1934, it was resolved, inter alia: * * * that the City National Bank be designated as the depository of the corporation; *228 all funds of the corporation to be deposited in that bank and withdrawals to be made therefrom on check signed by the Treasurer and countersigned by Robert Fineberg as Comptroller. * * * * *
that the City National Bank be designated as Trustee in all agreements of sale and that the receipts from the sales of all lots whether in individual sections or in units of Sections be deposited with the said City National Bank by the purchasers. On June 22, 1934, petitioner entered into an agreement with the City National Bank of Philadelphia. This agreement designated the City National Bank as "trustee" and provided, inter alia, as follows: * * * The Memorial Park agrees that all moneys received from the sale of burial sections or lots in the Memorial Park shall be deposited with the Trustee as Depository. Initial payments received at the time of the execution of contracts of sale shall be deposited with the trustee as soon as received by the Memorial Park or its agents. All payments on account of purchase price made subsequently to such initial payments and all other payments on account of interest or otherwise under such contracts of sale, shall be made direct to the Trustee by *229 the purchasers of sections or lots. All checks and other items received in payment of lots shall be made payable to the trustee, or endorsed to the order thereof. * * * No sections or lots in the Memorial Park shall be sold unless an initial cash payment of at least 20% of the purchase price is made by the purchaser at the time of the execution of the contract of sale. Upon receipt of such initial payment of 20% the trustee shall credit the same to the General Fund. * * * Each subsequent payment made by the purchaser of a section or lot in the Memorial Park when received by the trustee shall be credited by it to the General Fund, until one-half of the purchase price is paid when the balance of payments shall be apportioned as follows: (a) Perpetual Maintenance Fund
20%
(b) Improvement Fund
40%
(c) General Fund
40%
Total
100% so that when payment is made in full by the purchasers of a section or lot in the Memorial Park the Trustee shall have credited the same as follows: (a) Perpetual Maintenance Fund
10%
(b) Improvement Fund
20%
(c) General Fund
70%
Total
100%
* * * The Memorial Park covenants and agrees that each purchaser of a section or lot will receive *230 a good and sufficient deed of right of sepulchre to such section or lot in the Memorial Park when payment of all installments of purchase price and interest have been made in full. * * * A sum equal to 10% of the gross proceeds of funds arising from the sale of sections or lots in the Memorial Park shall as above provided be set apart and shall constitute a Perpetual Maintenance Fund, for the perpetual care and preservation of the grounds and the repair and renewal of the Memorial Park. A total of 10% of the total purchase price of all sections or lots shall be deducted from the payments on account of the purchase price of said sections or lots in the respective percentages herein before enumerated. The principal of such fund shall be held intact by the trustee and shall be invested in the manner hereinafter stated, and the net income from the principal of such fund shall be paid by the trustee to the Memorial Park. The Memorial Park covenants and agrees to use the income so received from the Perpetual Maintenance Fund for the perpetual care and preservation of the grounds, and the repair and renewal of the buildings and property of the Memorial Park. The principal of such Perpetual *231 Maintenance Fund shall be invested and re-invested from time to time by the trustee in such securities as from time to time shall constitute a legal investment for trustees under the laws of the State of Pennsylvania. * * * * *
IMPROVEMENT FUND * * * 20% of he total selling price of all sections or lots in the Memorial Park shall be set aside and shall constitute an Improvement Fund. The moneys so set apart for the Improvement Fund shall be expended for the purpose of developing, enlarging, improving and beautifying the Memorial Park, including the landscaping of the grounds, construction of roads, entrances, walls and a memorial chapel, the purchase or [sic.] equipment, and for any other charges which, in the judgment of the Board of Directors of the Memorial Park, shall be necessary or proper for the establishment of a Memorial Park or burial ground to be known as National Memorial Park. Payments from such Improvement Fund shall be made by trustee upon the following terms and conditions: (a) Upon presentation of a certificate of the architects or engineers having supervision of the particular work or improvement, certifying that the amount or amounts specified are due *232 for labor and material furnished, or expenses incurred in the improvement of the Memorial Park provided, however, that such certificate shall be accompanied by the written approval of the officers of the Memorial Park who shall be authorized to approve the same. (b) Upon presentation of bills or statements of architects, engineers, attorneys or any other persons who have performed services or incurred expenses in connection with the improvement of the Memorial Park, under the direction of the proper officers of the Memorial Park, where such services are not performed under the supervision of any architect or engineer, and where such bills or statements are accompanied by the written approval of the officers of the Memorial Park who shall be authorized to approve the same. (c) Upon presentation by the officers of the Memorial Park of cancelled checks or other evidence satisfactory to the trustee showing amounts expended in purchasing and acquiring title to real estate for the purpose of the Memorial Park, together with a certified copy of a resolution of the Board of Directors of the Memorial Park certifying that the amounts specified have been expended for such purpose, and requesting *233 the trustee to reimburse the Memorial Park out of the Improvement Fund for such expenditures. (d) Payments not in excess of the sum of $150.00 shall be made upon receipt of a written requisition, signed by the President and Comptroller. * * * * * GENERAL FUND * * * All moneys not required by the terms of this agreement to be set aside either for the Perpetual Maintenance Fund or for the Improvement Fund shall be credited to the General Fund of the Memorial Park, and shall be subject to the disposition of the Memorial Park without any supervision or control by the trustee. In the case, however, of receipts from sales of individual lots in which others have an interest with the said Memorial Park the trustees shall, before crediting the remainder as aforesaid, to the general fund, pay to such person or persons having an interest in the receipts from said lots their respective shares in accordance with the terms of any agreement which may be lodged with the said trustee. Interest received by the trustee on all installments of purchase price on sections or lots shall be credited by the trustee to the General Fund. * * * The trustee shall be under no duty or obligation to see *234 to the application of any of the moneys paid by it under the terms of this agreement to the Memorial Park, in the manner herein provided. * * * * *
The trustee shall make no covenant or representation respecting the rights of purchasers of sections or lots in the Memorial Park, or the correctness and sufficiency of any deed conveying said sections or lots, or the title conveyed thereby. It is agreed by and between the parties hereto, however, that in order that lots may be properly conveyed as sold that the said Memorial Park will immediately upon the execution hereof and from time to time thereafter as the same may become necessary, convey to the trustee by good and sufficient deed of conveyance title in fee to the ground upon which are located no less than three thousand (3,000) lots free of mortgage lien, and does hereby covenant and agree to and with the said trustee not to sell or dispose of the right of sepulchre to any section or lot other than those lots to which title has been conveyed to the trustee as aforesaid, and the trustee for is part agrees that it will hold title to such ground as may be conveyed to it in accordance with the terms hereof as trustee for the said *235 Memorial Park and its assigns, and that it will upon receipt of the purchase price from individual purchasers convey by approved deed sections or lots and the right of sepulchre therein to the pruchasers thereof, and that it will not in any manner or form alien or encumber the said ground, but will hold it solely for the uses and purposes herein specified. The agreement between petitioner and City National Bank was ratified at a special meeting of petitioner's directors, held on October 1, 1934. Petitioner operated under the agreement of June 22, 1934, with the City National Bank. On December 6, 1937, the trust agreement was amended but the agreement as amended was substantially the same as originally executed. On December 10, 1934, petitioner conveyed 3,004 cemetery lots to the nominee of City National Bank. On December 6, 1937, petitioner conveyed the entire property of the cemetery to the nominee of City National Bank. The sales contracts used by petitioner during the years involved herein provided, inter alia, as follows: The said party of the first part agrees to and with the said party of the second part that when payment in full has been made by the said party of the *236 second part in accordance with the provisions hereof, that good and sufficient deed to the said allotted section in the said Memorial Park conveying all rights therein to the said party of the second part will be delivered subject, however, to the rules, regulations and provisions now or hereafter made governing the conduct of the said National Memorial Park. The said party of the first part agrees to set aside and build up a fund for the improvement and beautification of the entire park including said section purchased by the said party of the second part, for cemetery purposes and in addition thereto to create a maintenance fund for the perpetual care and upkeep of the said Park. * * * * *
The party of the second part further agrees to accept, conform to and abide by the rules, regulations, plans for beautification, such as landscaping and buildings, and other provisions now in effect or hereafter made governing said Memorial Park. * * * * *
Upon acceptance by the party of the first part of this contract of sale each party agrees to carry out the terms hereof, and nothing not contained herein shall be binding upon the corporation or the party of the second part. or in any *237 way effect the validity of this agreement. The party of the first part will not be responsible for any act, verbal statements, or written representations made by its salesmen or employees unless such act, statements, or written representations are verified by the party of the said part at the time of purchase, and are approved by the party of the first part in writing. Such written approval must be appended hereto and be a part of the contract of sale. The contracts of sale were received in petitioner's office, together with the down payments. The contract of sale was then recorded in petitioner's sales register and the cash received from the customer was recorded in the cash receipts account. Where the down payment was 20 per cent or more of the sales price, petitioner would then deposit the money collected in one account, at the Hamilton National Bank for the account of City National Bank. A statement called "collection advice" was then prepared by petitioner in which the amounts received from each customer during a particular day and the allocation of such amounts to the various funds, in accordance with the agreement of June 22, 1934, were set forth. The collection advice, together *238 with a duplicate deposit slip, would then be forwarded to the City National Bank. All collections were allocated to the general fund until 50 per cent of the total installment payments had been made by the customer. Payments after the first 50 per cent had been collected were allocated; 20 per cent to the maintenance fund, 40 per cent to the improvement fund, and 40 per cent to the general fund. During the taxable years, petitioner made certain sales to customers who paid less than 20 per cent of the purchase price as a down payment. The collections from such sales were not forwarded to the City National Bank until the collections from the purchasers amounted to 20 per cent of the sales price, at which time, the contract, together with the 20 per cent payment, was forwarded to the City National Bank. If the purchaser did not complete payments up to 20 per cent of the purchase price, the money was retained by petitioner. When the last payment due from a purchaser was made, petitioner would forward to the City National Bank the indenture or deed to the purchaser for execution by the bank or its nominee. The bank or its nominee would execute the indentures or deeds and petitioner would *239 deliver them to the purchasers. These indentures provided, inter alia, as follows: That the said Grantor for and in consideration of the sum of $10.00 - * * * and other good and valuable considerations * * * has granted, bargained, sold, released, conveyed and confirmed, and by these presents does grant, bargain, sell, release, convey and confirm unto the said Grantee his heirs and assigns, subject to the conditions and restrictions hereinafter set forth, the right of sepulchre and the right to the exclusive use, occupation and possession for that purchase only in the lot of ground in the said National Memorial Park. * * * * *
The said Grantor as aforesaid, hereby covenants to and with the said party of the second part, heirs and assigns, that of the purchase price of all cemetery lots in this said Park there will be set aside thirty (30%) per cent, of which fund the City National Bank of Philadelphia shall be trustee; one-third of this said fund shall be capitalized and held intact and the income therefrom shall be used solely and perpetually for the purpose of maintenance and preservation of the said Memorial Park and for the proper upkeep thereof and the other two-thirds *240 thereof shall be used to erect buildings and make improvements. At a special meeting of petitioner's directors held on January 14, 1935, it was resolved that "the President and Treasurer be authorized to certify to the City National Bank from time to time as the occasion might arise such payments as may be made by the National Memorial Park for improvements in order that the same might be repaid to the corporation out of the improvement funds in the hands of the said trustee." It was further resolved that "the said Trustee is authorized to make such payments as may be certified to by the said Treasurer and Secretary." Petitioner made substantial expenditures for improvements in anticipation of the building up of the fund for improvement experiments. When petitioner expended money for improvements, it forwarded to the City National Bank a statement called "improvement certificate" which showed the amount expended for each improvement and certified that such amount had been so expended. From time to time the officials of City National Bank examined each improvement certificate and either approved the certificate or notified petitioner that the certificate contained amounts not properly *241 chargeable to improvements. If a certificate contained amounts not properly chargeable to improvements, an adjustment was then made and such amounts were transferred to other accounts. After the sales collections had been transmitted to the City National Bank, the bank acknowledged receipt thereof and notified petitioner in writing that the collections had been allocated to the various funds. The bank notified petitioner's treasurer twice a week as to the receipt of the collections and the allocation of the funds. Then, as the money accumulated in the improvement fund, the bank made reimbursement to petitioner from the fund and applied such reimbursement against the sum which had been certified to the bank by petitioner. The City National Bank maintained an account with the Pennsylvania Company in which all the funds received from petitioner were deposited. Petitioner had a separate bank account with the City National Bank designated as "National Memorial Park Operating Account." Instead of forwarding a check to petitioner, the City National Bank deposited amounts in petitioner's account. During the years 1935, 1936, and 1937, petitioner remitted the following amounts to the City *242 National Bank: 1935
$140,525.75
1936
365,543.00
1937
301,698.39
The amounts of the improvement certificates certified by petitioner, and the amounts paid thereon by City National Bank to petitioner, in the taxable years, are as follows: Improvement
Amounts
Certificates
Paid
1935
$31,625.05
$13,794.82
1936
46,603.15
57,761.85
1937
52,425.69
51,887.52 The above amounts which were certified to City National Bank do not show the various adjustments to such certificates. All the amounts paid by City National Bank out of the improvement fund were paid to petitioner. During the same period, petitioner spent the following amounts for improvements: 1935
$79,699.83
1936
39,582.57
1937
47,234.85
During the taxable years, petitioner's gross sales and collections were as follows: SALES Gross sales
Net sales
Gross sales
Net sales
where less
where less
where more
where more
than 30%
than 30%
than 30%
than 30%
down
Cancel-
down
down
Cancel-
down
payment
lations
payment
payment
lations
payment
1935
$345,098.60
$ 6,955.00
$338,143.60
$204,767.00
none
$204,676.00
1936
122,922.32
115,963.10
6,959.22
306,767.57
$35,505.50
271,262.07
1937
103,179.80
46,179.32
57,000.48
304,163.15
31,967.35
272,195.80
*243 Total [1]
net sales
1935
$542,819.60
1936
278,221.29
1937
329,196.28
COLLECTIONS 1934 sales
1934 sales
1935 sales
1935 sales
1936 sales
1936 sales
where less
where
where less
where more
where less
where more
than 30%
more than
than 30%
than 30%
than 30%
than 30%
down
30% down
down
down
down
down
payment
payment
payment
payment
payment
payment
1935
$2,914.50
$480.00
$45,539.72
$152,104.81
none
none
1936
3,579.13
none
43,611.90
23,553.64
$19,988.42
$221,478.80
1937
226.18
none
27,970.62
7,665.63
19,974.30
21,003.88
1937 sales
1937 sales
where less
where more
than 30%
than 30%
Total [2]
down
down
Total
collections
payment
payment
collections
1935
$201,039.03
1936
$312.211.89
1937
$17,869.40
$237,623.96
$332,333.97
*244 On its records, petitioner set up an account captioned "Reserve for Improvements," to which was credited the following amounts: 1934
$ 5,203.65
1935
108,248.42
1936
56,513.36
1937
65,649.06
1938
17,554.13
$253,168.62
During the years here involved no debit entries were made to this account. The credits to the reserve for improvements represented 20 per cent of the sale price of all lots sold during each year. In filing its returns for the taxable years, petitioner took the position that it was regularly engaged in selling personal property. In each of its returns for the taxable years, petitioner answered the question on the returns as to the basis of the return by writing in the word "installment." Petitioner kept its books on the accrual basis. In computing its gross income for the years 1935, 1936, and 1937, petitioner excluded *245 30.64 per cent of its cash collections made during each year. The figure, 30.64 per cent, was computed as follows: maintenance fund, 10 per cent; improvement fund, 20 per cent; and land cost,.64 per cent. Petitioner's returns for the years 1935 and 1937 were respectively filed on or about July 16, 1936, and November 30, 1938, which was not within the time prescribed by law. Respondent determined that "the installment basis for reporting profit from lot sales is not permissible since the method of reporting does not conform to the requirements of section 44(b) of the Revenue Acts of 1934, 1936, and 1938, and Articles 44-2 and 44-3 of Regulations 86, 94 and 101." Respondent computed petitioner's net taxable income on the basis of net profit realized from the lot sales in each of the taxable years. Respondent adopted as a basis for the cost of each year's sales the "cost of the land plus cost of land improvements proportionately allocated to the square feet of land in the lots sold." Amounts representing 20 per cent of the sales price of lots sold in the taxable years were not impressed with a trust and were not additional cost of the property. Opinion Issue 1. The first question *246 relates to determination of the amount which must be included in gross income in each of the taxable years on account of receipts from sales. Respondent has allowed petitioner to exclude from gross income 10 per cent of receipts from sales in each year. The correctness of that determination is not in issue. Of course, in the end, 10 per cent of the contract price under each contract will have been paid into the fund, called the Perpetual Maintenance Fund. The principal of that fund is to be "held intact by the trustee and shall be invested," and the net income of the fund is to be paid to petitioner who is to use it only for the perpetual care and preservation of the grounds, and the repair and renewal of the buildings and property of the Memorial Park. It is clear that 10 per cent of the receipts of purchase prices will be set aside in a fund held by a trustee, that the principal is to be preserved, and that petitioner will be entitled to receive only the income from the fund which is to be used for specific purposes. Respondent has allowed petitioner to exclude 10 per cent of its annual receipts under the rule in Mountain View Cemetery Association, 35 B.T.A. 893, *247 and cases cited therein; and Portland Cremation Ass'n v. Commissioner, 31 Fed. (2d) 843. Petitioner seeks to apply the rule, which excludes from gross income the payments into the Perpetual Maintenance Fund, to an additional 20 per cent of the receipts in each year. The result of this contention is that petitioner seeks to have a total of 30 per cent of receipts from purchasers in each year excluded from gross income. Petitioner relies chiefly upon the provision in the agreement of June 22, 1934, with the City National Bank of Philadelphia, in which it is recited, inter alia, that petitioner desires the bank to act as trustee of that portion of the receipts which is to be set aside in an improvement fund. In Mason Securities Association, 36 B.T.A. 958; affd., 102 Fed. (2d) 362, the rule under which part of receipts may be excluded from gross income is restated, and the leading authorities are cited. We need not repeat what was said there. We may add, however, that the usual situation in which the rule applies is one in which a fund is established, the principal of which is held in trust *248 and is not subject to the control of the taxpayer. The title to the fund is elsewhere than in the taxpayer, and only the income of the principal is payable to the taxpayer. The principal of the fund is not payable to the taxpayer. The question here must be decided upon the facts and the material facts are summarized as follows: The bank agreed to act as both trustee and depository under the agreement of June 22, 1934. Under the contract, at first, petitioner is to deposit all moneys received from purchasers "with the Trustee as Depository." The initial payments received at the time of the execution of the contracts of sale and subsequent payments, until one-half of the purchase price under each contract is paid, is credited by the trustee to a fund called the General Fund. After one-half of the purchase price is paid, the balance of the payments is to be apportioned, 40 per cent to the Improvement Fund, 40 per cent to the General Fund, and 20 per cent to the Perpetual Maintenance Fund, so that when the full purchase price has been paid, there will have been credited 10 per cent of the contract price under each contract to the Perpetual Maintenance Fund, 20 per cent to the Improvement *249 Fund, and 70 per cent to the General Fund. The question under this issue relates to 20 per cent of receipts in each year. Petitioner was organized in 1933. The taxable years are 1935 to 1937, inclusive. The sales contracts call for monthly payments until the entire purchase price is paid. There has been no break-down by petitioner for any one of the taxable years to show what amounts received in the taxable years represent payments on account of the first half of the purchase price, and payments on account of the second half of the purchase price. Considering the fact that petitioner started business only two years before the taxable years, it is reasonable to believe that a substantial portion of the receipts in the taxable years were on account of new contracts and represented payments on account of the first half of the total prices. And so at the outset, the issue has not been framed so as to present squarely the precise question of how to treat amounts actually credited to the Improvement Fund by the bank in each year. In the taxable years petitioner received cash payments under purchase contract; excluded 30.64 per cent from gross income; and reported 69.36 per cent in gross *250 income, as follows: Amount
Amount
excluded
included
from gross
in gross
Cash Receipts
income
income
1935
$200,355.53
$ 61,388.93
$138,966.60
1936
303,870.50
93,105.92
210,764.58
1937
328,422.69
100,628.71
227,793.98 That is, petitioner computed its cost of the property sold at.64 per cent, and excluded from gross income 30 per cent. But petitioner has not offered any evidence to show what amount of the sum excluded from gross income in each year was allocated by the bank and credited to either the General Fund or the Improvement Fund under the 1934 agreement. Neither has petitioner offered any evidence to show how the bank allocated all of the moneys which petitioner paid over to the bank. We are left to assume that the bank allocated some of the moneys paid over to it in each year to the Improvement Fund as well as to the General Fund. The lack of evidence on the above matters is unfavorable to petitioners' case. Under the agreement the payments on account of the first half of the contract price were not to go into the Improvement Fund, but were to go into the General Fund. Therefore, assuming for purposes of argument only, that payments *251 into the Improvement Fund partake of the same legal nature as payments into the Perpetual Maintenance Fund, i.e., are trust funds, petitioner must fail because it has not shown the amount of the receipts in each taxable year which belong in the Improvement Fund and were credited to that fund by the bank. Under the agreement with the bank, 100 per cent of payments in each year under some sales contracts will go into the General Fund, and under other contracts 40 per cent of payments will go into the General Fund and 40 per cent will go into the Improvement Fund. The agreement does not provide that 20 per cent of each payment under each sales contract is to be set aside in the Improvement Fund. Accordingly, it could not be held that 20 per cent of all receipts in each of the taxable years is impressed with a trust, and therefore should be excluded from gross income, even if petitioner's theory that the Improvement Fund is a trust fund was correct, which we doubt. There is some indication in the record that amounts paid to petitioner by the bank in the taxable years for improvement and developmental expenses were paid from the Improvement Fund as it was set up in the bank's accounts *252 but, at best, the evidence on that point is vague. However that may be, and giving petitioner the benefit of the doubt, there is no relation between the amounts which the bank paid to petitioner in the taxable year against improvement certificates, and the total amounts which petitioner paid to the bank in each year or the amounts excluded from gross income in each year. The point here is, that petitioner had the burden of proving that 20 per cent of the receipts in each year, which it excluded from the gross income, was set aside in a trust fund, and petitioner has not met that burden of proof. Even the above is not accurate (and it is difficult to be accurate in view of the way the issue has been framed). Under the agreement, and to be consistent with it, petitioner ought to be contending that 40 per cent of certain amounts received under particular contracts are to be excluded from gross income, rather than 20 per cent of all receipts in each year. Perhaps the problem which a faulty framing of the issue presents has invited too lengthy a discussion, but from the discussion it is apparent that petitioner's burden is two-fold: first, to prove that the amount which may be excluded *253 properly from gross income in each year; and second, to prove that a trust was impressed upon moneys which were in fact allocated in each year to the Improvement Fund. Petitioner having failed to meet the burden of proof under the first point, we would not go further, ordinarily. However, this case affords an opportunity to petitioner to settle a problem which confronts it every year. That is important to petitioner. In order that this proceeding may yield the most aid to petitioner, we, therefore, give consideration to the second point, under which the question is, whether funds properly allocated by the bank in each year to the Improvement Fund, in full compliance with the agreement, are impressed with a trust. In our opinion this question must be decided adversely to petitioner. In the sales contracts, petitioner did not covenant to deposit in any fund, trust or otherwise, any percentage of the contract price. Petitioner merely agreed to "set aside and build up a fund for the improvement and beautification of the entire park including said section purchased * * * for cemetery purposes." In the agreement of June 22, 1934, with the bank, the bank agreed to act as "depository *254 and trustee." Reading that agreement in its entirety, only the Perpetual Maintenance Fund was a trust fund over which petitioner had no control. Only the principal of that fund was to be kept intact and invested by the bank, as trustee, under Pennsylvania laws regulating legal investments of trustees. On the other hand, the Improvement Fund was to be expended and used; it was to be repaid to petitioner or its order, and the only restrictions under the agreement related to the method of making payments out of the fund, i.e., payments were to be made by the bank upon presentation of a certification as to the work done, that the amount to be paid is for labor, materials, or expenses incurred in the improvement of the Memorial Park. In the first instance, it is left with the judgment of petitioner's directors what expenses shall be incurred within the wide range of general construction and improvement described in the sixth paragraph of the agreement. All of the terms of the sixth paragraph, part of which is set forth in the findings of fact under the title "Improvement Fund," relate to mechanical matters such as a bank's comptroller and auditors would require in connection with disbursements *255 out of depository account, and those mechanical provisions relating generally to certification, approval by petitioner's authorized officers, etc., do not in any way serve to give the Improvement Fund the legal status of a trust fund. In our opinion, the Improvement Fund was nothing more than a fund created by petitioner under a deposit arrangement under which the entire fund was subject to petitioner's complete control, and under which the bank acted as a depository only. The orderly procedure prescribed for withdrawals from the fund under petitioner's order did not serve any other purpose than to facilitate good accounting and compliance with the ordinary requirements of a depository. The situation was, in substance, no different from that in Memphis Memorial Park, 28 B.T.A. 1037; aff'd, 84 Fed. (2d) 1008, and that case is authority for denying petitioner's contention here. Much that was said in that case is applicable here: * * * Petitioner carried on its improvement program apparently without regard to the amount which, according to the account, was available for that purpose, and the nature and extent of the improvements *256 to be made was entirely within the discretion of petitioner's directors. * * * Then, too, the contract [here the agreement with the bank] leaves the expenditure of the fund so far to the discretion of the directors as to prevent the establishment of a definite trust for a specific purpose. The "purpose of developing, enlarging, improving, * * * including real estate" might well authorize the purchase of additional property, and it would be difficult to conceive of a broader provision respecting improvements for the benefit of a lot owner than "the purchase of equipment and for any other charges which, in the judgment of the board of directors, shall be necessary or proper for the establishment of a memorial park, or burial ground." In this case, petitioner anticipated the accumulations in the Improvement Fund, going ahead with improvements, landscaping, road-building, laying of drainage, etc., to the extent that at the end of 1938, $207.734 was charged on petitioner's books to improvements, of which $203,588.92 still remained to be certified to the bank. Petitioner, of course, had capital with which to proceed in advance of the accumulation of an Improvement Fund in the hands of *257 the bank, so that the improvement program, entirely under petitioner's control, was carried on without regard for the Improvement Fund in the hands of the bank, and that fund was to serve to reimburse petitioner for its advance expenditures or accruals. It is provided in the agreement with the bank that: The Memorial Park shall have the right, at any time, to add to the Perpetual Maintenance Fund any portion of the moneys in the Improvement Fund, which, in the opinion of the Board of Directors of the Memorial Park, shall not be necessary for the Improvement of the Memorial Park. However, until such transfer of funds is made out of the Improvement Fund into the Perpetual Maintenance Fund, which is a trust fund, no trust is impressed upon the moneys in the Improvement Fund, in our opinion. Under petitioner's theory, again, if the Improvement Fund could be regarded as a trust fund under any possible construction, it is clear that petitioner itself is the beneficiary of the fund, and that, in any year, petitioner is entitled to receive any amount which is spent for improvements and certified. Thus, even if in the first instance, part of receipts could be excluded from gross income *258 as trust funds, petitioner would be required to include in gross income the amounts which the bank paid or credited to it during the year. See section 162(c) of the Revenue Acts of 1934 and 1936. The two factors which are determinative are, (1) that the principal of the Improvement Fund (which petitioner voluntarily created with the bank, without obligation to its vendees) inures to the benefit of petitioner, and (2) petitioner has complete control over the use of the fund which was payable to itself or to others designated by petitioner. In the presence of these factors, no trust was impressed on the Improvement Fund. Cf. American Cemetery Co. v. United States, 28 Fed. (2d) 918, 919, where it is said: * * * If, * * * a trust is created, and a taxpayer is bound, either by statute or its agreement, to pay certain sums into a trust fund, and if such trust fund is entirely beyond its control, and if the principal and income from such trust cannot inure to the benefit of the plaintiff, then the sums paid into the trust are not considered as a part of the plaintiff's income. * * * The above could not be said here. To exclude from petitioner's gross income *259 sums allocated to the Improvement Fund would violate the definition of gross income. See section 22(a) of the Revenue Acts of 1934 and 1936. Petitioner could use the money from the Improvement Fund to acquire additional land, to purchase equipment, to contruct roads, entrances, walls, and a memorial chapel, or for any other purpose which was deemed necessary and proper by petitioner, for the establishment of the cemetery. It is hard to imagine any other purposes by which an organization engaged in operating a cemetery could derive any greater economic benefits from income in carrying on such business. Furthermore, the making of such improvements was a necessary part of petitioner's business, without which petitioner could not sell lots with burial rights for any length of time. Under all of these considerations, it is immaterial that salesmen represented to purchasers that a part of the proceeds under the contracts would be set aside for improvements or that the deeds issued by the bank stated that 30 per cent of the purchase price would be held by the bank as trustee, two-thirds of which would be used to make improvements. It is held that the Improvement Fund in the bank was not *260 a trust fund. Petitioner's contention that 20 per cent of its receipts from sales contracts should be excluded from gross income in each taxable year is denied. Petitioner places special emphasis on Portland Cremation Ass'n v. Commissioner, supra. Upon due consideration that case, upon its facts, is distinguishable. The facts there are that the association gave deeds to purchasers containing a covenant that it would maintain a niche or vault forever, and oral representations were made that the covenant would be guaranteed by a permanent maintenance fund which could not be used for any other purpose. The fund was created, it was invested in bonds, and the income was used for the upkeep of the property. The Court concluded that the written covenant, the oral representations, and the corporate acts, combined, were such that any diversion of moneys from the fund for corporate purposes or other purposes than those designated could be enjoined by a suit in equity as a violation of a trust agreement. In contrast, in this case, the sales contracts provided that petitioner would not be bound by any oral or written representations of its salesmen unless such *261 were made part of a written contract; the agreement with the bank provided that the bank would make no covenant respecting the rights of purchasers of lots; the sales contract provided only that a fund would be set aside for improvement of the entire park without guaranteeing that any fixed percentage of the contract price would be set aside in such fund; and that the agreement with the bank provided that the fund could be used for such wide purposes as enlarging the Park. The terms of the deeds to purchasers stated that only one-third of the contract price would be held intact. The only provision in the deed relating to 20 per cent of the contract price was that two-thirds "shall be used to erect buildings and make improvements." From such provision a trust cannot be inferred. The facts here do not bring this case within the rule of the Portland Cremation Ass'n case. It is pointed out, further, that in paragraph Eighth of the agreement with the bank it is provided that: The trustee shall be under no duty or obligation to see to the application of any of the moneys paid by it under the terms of this agreement to the Memorial Park, in the manner herein provided. Issue 2. *262 The question under this issue relates to the method of computing the cost of sales of burial lots in each year. Petitioner argues that "a sum which a vendor is bound to expend for improvements is deductible as part of the cost of the property in determining the profit on the sale thereof, Milton A. Mackay, 11 B.T.A. 569; Birdneck Realty Corporation, 25 B.T.A. 1084." Petitioner, in its brief, contends that respondent erred in failing to allow a "deduction" of 20 per cent of gross sales in each year. It appears from the allegation in the petition, IV(g), and from petitioner's brief that petitioner is not claiming a "deduction" of 20 per cent of gross receipts from sales, in each year, but means that an amount measured by 20 per cent of gross sales should be added to the cost of property sold in each year. The issue is not presented clearly. It appears that petitioner does not contend that there should be added to the cost of the cemetery lands, $32,202.32, an estimated amount of future expenditures for improvements, for example, perhaps the sum of $203,588.92. Cf. Birdneck Realty Corporation, supra. *263 Respondent determined that "The basis for the cost of each year's lot sales is cost of land plus cost of land improvements proportionately allocated to the square feet of land in the lots sold. Section 113(b)(1), Revenue Acts of 1934, 1936, and 1938, and article 113(b)-1 of Regulations 86, 94 and 101." Whether or not a fixed percentage of the receipts from the sales of burial lots should be deducted as an expense in the year in which the sale is made or included in the cost of the lots sold has been considered before, and the rule has been established. We do not find any special facts or circumstances here to provide reasons for any different rule upon which this petitioner should compute the cost of lots sold in each year. The problem of petitioner under this issue is to be worked out under Rule 50, in accordance with the conclusion made hereinafter under Issue 3. In anticipation of what will be said hereinafter under that issue, it is pointed out now that some of petitioner's sales may be reported on the accrual basis in those instances where the "initial payments" exceed 30 per cent of the contract price, and some sales, within the 30 per cent limitation prescribed by *264 section 44(b), may be reported on the installment basis. The respondent has allowed petitioner to exclude from income 10 per cent of the contract price. The effect to be given to that determination is described in Community Mausoleum Co., 33 B.T.A. 19. The rule set forth there disposes of the 10 per cent portion of receipts from sales. There remains the problem of how to treat expenditures made for improvements in each year. Under Issue 1 it has been held that no trust was impressed upon 20 per cent of each contract price. One of the reasons for that conclusion was that, although petitioner was under a contractual obligation, under the terms of the contracts, to make improvements and beautification of the entire park, still petitioner was not bound to make specified expenditures, and the matter was entirely within the control of petitioner's directors. See Memphis Memorial Park, supra, p. 1044. In the Mackay and Birdneck Realty cases, upon which petitioner relies, "the expenditures which the vendor was bound to make, and which consequently were added to the cost of the property, were either fixed in amount *265 or the improvements were so specifically described that their cost could be estimated with reasonable accuracy." Memphis Memorial Park, supra.The evidence in this case is not to that result. Petitioner has not introduced evidence to show that it could estimate or had estimated the reasonable or probable cost of improvements. We do not know what petitioner's plan for total improvements is. It was pointed out in Acacia Park Cemetery Association, Inc., 27 B.T.A. 233; aff'd 67 Fed. (2d) 700, that "Expenses are deductible when paid or incurred. Even when it is known that expenses will be incurred in a subsequent year it is not ground for allowing a deduction in a previous year." As stated before, the lack of definiteness in the pleadings and the lack of evidence on total estimated cost of improvements makes it impossible to get to any consideration of a possible question of the propriety of capitalizing and adding to the cost of all of the property, the estimated cost of all improvements to be made. If that were possible, an annual capitalization of 20 per cent of total estimated cost of all improvements, *266 present and future, probably would not be allowable, but we cannot consider such aspect of the question and do not do so, other than has been done under Issue 1. All that remains is to consider the correctness of respondent's procedure. He has added to the cost basis of lots sold in the taxable years, the cost of improvements actually made in each taxable year, allocated per square foot in computing gain. That course of respondent is sustained. Memphis Memorial Park, supra.
Issue 3. The question under this issue is whether the sales of burial lots were sales of realty or sales of personalty for purposes of reporting income on the installment basis under section 44. [1]
*267 If cemetery lots are "realty" within the meaning of section 44 (b), petitioner may report its taxable income on the installment basis under regulations prescribed by respondent in respect to only that income which is attributable to sales of the cemetery lots where the initial payments do not exceed 30 percent of the sales price. Therefore, it must first be determined whether cemetery lots are "realty" within the meaning of section 44(b). In G.C.M. 7871, C.B. IX-1, p. 207, it is stated: From the foregoing, it follows that in construing the expression "real property" as used in section 212 (d) of the 1926 Act, the words must be given their usual and common signification. Accordingly, the phrase "a sale or other disposition of real property" in that section must mean a sale or other disposition of land or of rights in or to land. Thus, it is apparent from the above that respondent has interpreted the term "real property" as used in section 44(b) to mean rights in land. The sales contract used by petitioner during the taxable years provided that when the purchase price had been paid in full, good and sufficient deed to the said allotted section in *268 the said Memorial Park conveying all rights therein to the said party of the second part will be delivered, subject, however, to the rules, regulations and provisions now or hereafter made governing the conduct of the said National Memorial Park. In the agreement between petitioner and the bank, petitioner agreed that "each purchaser of a section or lot will receive a good and sufficient deed of right of sepulchre to such section or lot * * *." The indentures, which were executed by the nominee of the bank and delivered to the lot purchasers by petitioner, conveyed to the purchasers, subject to the conditions and restrictions set forth in the indentures, "the right of sepulchre and the right to the exclusive use, occupation and possession for that purpose only, in the lot of ground in the said National Memorial Park * * *." Respondent contends that the property sold by petitioner was real property. He relies on Community Mausoleum Co., supra. In this case, it was held that sales of burial crypts in a mausoleum located in Missouri were sales of realty. In reaching that decision, it was stated "the right of burial being an easement, Mt. St. Mary's Cemetery *269 Ass'n v. Mullins, supra [259 Mo. 142], Roanoke Cemetery v. Goodwin, 101 Va. 605; 44 S.E. 769, it is an estate in land * * *." In Mullins v. Mt. St. Mary's Cemetery Ass'n et al., supra, the question involved was whether special tax bills for sewer construction were assessable against the cemetery as one tract or against the separate lots. The Court held that the lot owners only had an easement of the right of burial in the ground and that the tax bills were assessable against the cemetery as one tract. In Roanoke Cemetery Co. v. Goodwin, supra, the question was whether the cemetery could enforce its rules and regulations in respect to opening graves. A purchaser of a lot undertook to have an undertaker open a grave in violation of the cemetery's rules. In sustaining the cemetery, the Court held that the lot owner's interest was in "the nature of an easement, with the exclusive right to bury in the lots, subject to the general proprietorship and control of the association * * *." Petitioner contends that the sales of cemetery lots were sales of personalty *270 and not realty. It relies on Grinnan et al. v. Fredericksburg Lodge No. 4 A.F. & A.M., et al., 118 Va. 588, 88 S.E. 79. In this case an injunction was filed to enjoin the removal of bodies from a plot in a Masonic cemetery. The lot had not been purchased nor had a certificate been issued and held as evidence of title. The court in refusing the injunction stated that a lot owner only had a mere privilege or license to make interments in the lot exclusively of others as long as the burying ground or cemetery remained as such. The above case is not authority for and is not pertinent to petitioner's contention under this issue. In a subsequent case, Goldman et al. v. Mollen et al., 168 Va. 345, 191 S.E. 627, involving the question as to the removal of a body to another cemetery, it was stated: * * * That this may be done, cemeteries where permanent care is measurably assured are usually selected. Title to lots therein is not ordinarily absolute, nor is a deed necessary. That acquired is rather in the nature of a permanent easement. Roanoke Cemetery Co. v. Goodwin, 101 Va. 605, 44 S.E. 769. *271 Thus, it is apparent that under the law of the State of Virginia, the purchaser of a lot has an interest therein which is in the nature of an easement. It is to be noted that in expressing this rule, Roanoke Cemetery Co. v. Goodwin, supra, was cited as authority and special reference was made to cemeteries providing permanent care as is the case here. It is concluded that the sales of cemetery lots by petitioner were sales of interests in realty. See, also, American Jurisprudence, Vol. 10, section 22, p. 503; Corpus Juris Secundum, Vol. 14, section 25, p. 84; Mount Hope Cemetery Ass'n, 37 B.T.A. 671, 681; and Oak Woods Cemetery Ass'n, 38 B.T.A. 121; aff'd 111 Fed. (2d) 863; certiorari denied, 308 U.S. 616. It follows that petitioner's right to report income on the installment basis comes within the provisions of section 44(b) and does not come within the provisions of section 44(a). It appears from the evidence that a substantial part of petitioner's sales during the taxable years were made either for cash or for "initial *272 payments" which were in excess of 30 per cent of the contract price. Such sales, being outside of the provisions of section 44(b), should be reported on the accrual basis. Community Mausoleum Co., supra.Where the accrual method is employed the full amount of the contract price, less the 10 per cent set aside for the perpetual maintenance trust fund, should be reported in the year of sale. With respect to the sales which come within section 44(b), the installment basis of reporting may be used by petitioner. In using the installment basis, petitioner must return as income "that proportion of the installment payments actually received in that year which the gross profit realized or to be realized when payment is completed, bears to the total contract price." In ascertaining the two terms of this ratio, the gross profit and contract price, the 10 per cent paid by each purchaser for the perpetual care fund should be excluded both from the gross profit and from the contract price. See Community Mausoleum Co., supra. We are of the opinion that no weight can be given to respondent's contention that the installment basis cannot *273 be used by petitioner. Such contention is founded on the arguments that petitioner failed to keep its books in a manner which was sufficiently accurate to meet the requirements of respondent's regulation and that petitioner improperly computed its taxable income by including the 10 per cent for the maintenance fund in its gross sales. We believe this contention arises more from the existence of issues between the parties prior to this proceeding, which the holdings made here dispose of, rather than from what the books of petitioner show. Petitioner's books show the total sales for each year; the sales where the initial payments were less than 30 per cent of the contract price and where they were more than 30 per cent of the contract price. Also, the cancellations and the collections from each of these two classes of sales during each of the years are determinable from petitioner's books. The fact that there were discrepancies between the amounts of collections and sales as adduced at the hearing and such amounts as shown by petitioner's books does not deprive petitioner of its privilege of using the installment basis of reporting income in the proper instances. The discrepancies *274 were not substantial, and to a large extent they have been explained. We are of the opinion that petitioner's books have been kept with sufficient accuracy to meet the requirements of respondent's regulations. See Community Mausoleum Co., supra;Hood & Wheeler Furniture Co., 22 B.T.A. 158; and Law of Federal Income Taxation, Mertens, Vol. 2, section 15.04, p. 453. It is held that petitioner's income should be recomputed under Rule 50 in accordance with the principles stated. The last question for consideration is whether petitioner is subject to the 25 per cent penalty provided for in section 291 of the Revenue Acts of 1934 and 1936 for failure to file its income tax returns for the years 1935 and 1937 within the time prescribed by law. Apparently, petitioner concedes this issue; it did not submit any evidence at the hearing nor has it made any argument in its briefs relative to the delinquency penalties which have been added to the deficiencies in tax. The income tax return for the year 1935 was not filed with the collecter until July 16, 1936, and the 1937 return was not filed until November 30, 1938, which was after the *275 time prescribed by law. No reasonable cause for the delinquency in filing the returns having been shown, the imposition of the delinquency penalties are mandatory. See Estate of Frederick C. Kirchner, 46 B.T.A. 578; John Balestreri, 47 B.T.A. 241; and Carding Gill Limited, 38 B.T.A. 669. It is held that petitioner is subject, under section 291 of the Revenue Acts of 1934 and 1936, to delinquency penalties of 25 per cent of the tax for the years 1935 and 1937. Decision will be entered under Rule 50. Footnotes
1. There are discrepancies between these amounts and the amounts shown on petitioner's books. However, when the discrepancies are considered together, there is only a discrepancy of a few hundred dollars. The sales price is the total contract price without any exclusion of amounts which were to be set aside for maintenance or improvement.↩
2. There are discrepancies between these amounts and the amounts shown on petitioner's books. A substantial part of such discrepancies arise from including sales discounts in cash and the transfer of certain accounts receivable. Such discrepancies are in excess of the amounts of collections returned by petitioner in the taxable year.↩
1. SEC. 44. INSTALLMENT BASIS. (a) Dealers in Personal Property. - Under regulations prescribed by the Commissioner with the approval of the Secretary, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit realized or to be realized when payment is completed, bears to the total contract price. (b) Sales of Realty and Casual Sales of Personalty. - In the case (1) of a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year), for a price exceeding $1,000 or (2) of a sale or other disposition of real property, if in either case the initial payments do not exceed 30 per centum of the selling price (or, in case the sale or other disposition was in a taxable year beginning prior to January 1, 1934, the percentage of the selling price prescribed in the law applicable to such year), the income may, under regulations prescribed by the Commissioner with the approval of the Secretary, be returned on the basis and in the manner above prescribed in this section. As used in this section the term "initial payments" means the payments received in cash or property other than evidences of indebtedness of the purchaser during the taxable period in which the sale or other disposition is made.↩